UNITED STATES of America, Appellee,

v.

Wakeem BUTLER, Stanley Harris, and Marcellus Thomas, Defendants–Appellants.

Nos. 778, 776, 801, Docket 91–1349, 91–1350 and 91–1369.

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1992.

Decided June 23, 1992.

Julie Copeland, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. E.D. New York, Emily Berger, Asst. U.S. Atty., on the brief), for appellee.

Christine Yaris, New York City (Joel Cohen, on the brief), for defendant-appellant Wakeem Butler.

Harriet B. Rosen, New York City, for defendant-appellant Stanley Harris.

Erica Horwitz, New York City, for defendant-appellant Marcellus Thomas.

Before: NEWMAN and KEARSE, Circuit Judges, and MARSHALL, Associate Justice Retired *.

KEARSE, Circuit Judge:

Defendants Wakeem Butler, Stanley Harris, and Marcellus Thomas appeal from judgments entered in the United States District Court for the Eastern District of New York following a jury trial before I. Leo Glasser, *Judge*, convicting each of them of obstructing, delaying, and affecting interstate commerce by robbery and of conspiring to do so, in violation of 18 U.S.C. § 1951 (1988) (the "Hobbs Act counts"); and convicting Harris and Thomas of using and carrying firearms during the robbery, in violation of 18 U.S.C. § 924(c) (1988). Butler was sentenced principally to 126 months' imprisonment on the Hobbs Act counts, to be followed by a three-year term of supervised release. Harris was sentenced principally to 240 months' imprisonment on the Hobbs Act counts, to be followed by 60 months' imprisonment on the firearm count, with the prison terms to be followed by a three-year term of supervised release. Thomas was sentenced principally to 210 months' imprisonment on the Hobbs Act counts, to be followed by 60 months' imprisonment on the firearm count, with the prison terms to be followed by a three-year term of supervised release. On appeal, Butler principally challenges the sufficiency of the evidence to support his conviction; Harris contends principally that evidence of an out-of-court identification should have been suppressed as the product of an impermissibly suggestive showup; and Thomas contends that the court erred in sentencing him under the federal Sentencing Guidelines as a "career offend-

---

* Honorable Thurgood Marshall, Associate Justice Retired of the Supreme Court of the United States, sitting by designation.

er." For the reasons below, we affirm the convictions of Butler and Harris; we vacate Thomas's sentence and remand for further proceedings and resentencing.

## I. BACKGROUND

The present prosecution arises out of the November 9, 1990 robbery of the M.U.H. Check Cashing business ("MUH"), operated in a storefront office in Brooklyn, New York. At about 8:20 a.m., as armored car guards arrived to deliver $151,000 to the store, two armed men, one wearing a ski mask, followed the guards in and ordered them to hand over their guns and the money. The guards' bag of money was taken from the store by the unmasked robber; the masked robber remained behind a moment longer. When the robbers entered, Maryanne Sundbye, a part-time employee who was the owner's sister, was behind the bullet-proof glass teller windows that normally separated MUH's customers from its employees. She watched the events, which she said lasted less than three minutes, from not more than 10 feet away.

Outside, a street vendor near the entrance had been forced to kneel on the ground and put his hands over his head. Two witnesses outside saw him kneeling. One of the witnesses, driving by, also saw the armored car guards inside with their hands up; he saw a man whom he later identified as Thomas leave the store carrying an Uzi submachine gun and a bag and get into a brown van, and saw another man subsequently leave the store and get into the van. The other witness saw the van, which he noticed was a brown Ford with a broken window, being driven off, and he heard someone jump into the van as it was moving away.

The police, promptly alerted to the robbery, the description of the van, and the direction in which the robbers had gone, apprehended a brown Ford van with a broken window within about 10 minutes. Thomas, Harris, and Butler were in the van; there was no sign of the money or the guns.

Sundbye, a coworker, and the armored car guards were then taken to where the van had been apprehended, and the suspects were brought, one by one, to the police car in which Sundbye and the others were sitting. She did not recognize Butler, the first suspect brought to the car. She identified Harris, the second suspect brought to the car, as the masked robber who had done the talking and who had momentarily remained behind. The ski mask's openings had not completely concealed the robber's face, and Sundbye identified Harris from his build, his clothing, and his skin color. She identified Thomas, the third suspect brought to the police car, as the unmasked robber who had left with the bag of money.

All three suspects were arrested. In a postarrest interview, Butler told FBI agents that he had gotten out of the van at MUH, but he said the robbery had not been his idea and had been a spur-of-the-moment action. He denied knowledge of what had happened to the guns and the money, saying that when he reentered the van, he had closed his eyes.

In a three-count indictment, all three defendants were charged with one count of obstructing, delaying, and affecting commerce by robbery, in violation of 18 U.S.C. § 1951 (count 2), and of conspiring to do so, in violation of § 1951 (count 1); Harris and Thomas were also charged with using and carrying firearms during the robbery, in violation of 18 U.S.C. § 924(c) (count 3). The jury found defendants guilty of all the charges against them, and they were sentenced as indicated above.

## II. DISCUSSION

On appeal, Harris contends, *inter alia,* that the police conducted an impermissible showup at the site of the apprehension of the van and that evidence of Sundbye's identification at that time should have been excluded at trial. Butler contends that the evidence was insufficient to convict him and that he was prejudiced by a part of the government's opening statement that was not substantiated by the evidence. Thomas contends that the court erred in sentencing

him as a "career offender." We find merit only in Thomas's challenge to his sentence.

## A. The Identification Testimony

█ Prior to trial, Harris and Thomas moved unsuccessfully to suppress evidence of the identification of them by Sundbye at the site where the police had stopped the van. Harris pursues here his principal argument that the officers' bringing the suspects to the police car for Sundbye to view them was an impermissible showup, and he argues that her testimony was inherently suspect because prior to the showup she apparently had not given the officers any descriptions of the robbers. We reject these contentions.

█ When a pretrial identification procedure has been suggestive, the court must assess the likely reliability of the identification in light of "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *accord Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). For both pretrial and in-court identifications, the linchpin of admissibility is reliability. *Id.* at 106 n. 9, 114, 97 S.Ct. at 2249 n. 9, 2253. The determination of whether or not the identification is sufficiently reliable to be admitted must be made in light of the totality of the circumstances. *Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. at 382.

In the present case, after hearing testimony at a *Wade* hearing, *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the district court found that Sundbye's identification testimony was reliable. That finding is supported by the record. Sundbye had a clear view of the robbers through the teller windows while the robbery was in progress. She was no more than 10 feet away from the action, and her testimony indicated that she had paid close attention and had observed the robbers' appearances and their actions. Her identification of the suspects, less than 30 minutes later, when they were brought to the police car in which she was sitting was unequivocal and selective: she did not identify Butler, the first man brought to the car (Butler had remained outside the store); she did identify the second and third, Harris and Thomas, as the robbers who had entered the store. We conclude that the record supports the district court's finding that, in all the circumstances, Sundbye's identifications were sufficiently reliable to be admitted into evidence. Any flaws in these identifications went to their weight rather than their admissibility.

In a *pro se* brief, Harris also claims, *inter alia*, that the police lacked probable cause to arrest him and that evidence that the van had been stolen was improperly admitted at trial. These claims provide no ground for reversal and do not require discussion.

## B. The Sufficiency of the Evidence To Convict Butler

█ Butler points out that no witness identified him as one of the robbers, and he contends that the evidence introduced at trial showed only that he was present at the scene and that it was insufficient to support his conviction for robbery or conspiracy to commit robbery. He also contends that there was no evidentiary support for so much of the government's opening as stated that Butler's role in the robbery was to "remain[ ] outside [MUH] holding a gun at the neck of a man who sold watches on the street." Neither of Butler's arguments has merit.

█ In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. *United States v. Esdaille*, 769 F.2d 104, 108 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985); *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir. 1985); *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing such a challenge, we

must credit every inference that could have been drawn in the government's favor, *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986); *United States v. Taylor*, 464 F.2d 240, 244–45 (2d Cir.1972). The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). These principles apply whether the evidence being reviewed is direct or circumstantial. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Butler has not met his burden here.

The proof at trial included the following. According to Sundbye, Harris and Thomas entered the MUH office on the heels of the guards. Outside, as Carlos Rivera, the street vendor, set up his watches and other wares in front of MUH, he was accosted by a man approaching from the street who brandished a gun and told him to get down on the ground or he would be killed. On his way down, Rivera looked behind him toward the MUH store and saw "that something strange was happening in there." He saw the front door being held open, though he could not see the person holding it open, and he saw a weapon. Rivera remained in his kneeling position throughout the robbery. A witness arriving at his office across the street, saw Rivera kneeling on the sidewalk and saw the armored car guards inside MUH with their hands raised. Butler, apprehended with Harris and Thomas in the brown van minutes after the robbery, admitted that the van had been at MUH, that he had gotten out of the van at the site of the robbery, and that he had reentered the van after the robbery.

This evidence was ample to permit a rational juror to infer beyond a reasonable doubt that the robbery was in progress when Rivera was forced to his knees and looked back at the MUH office; that there were three men involved in the robbery, the two who followed the armored car guards inside, and a third who remained outside preventing street vendors and passersby from interfering; and that Butler was that third robber. We conclude that the evidence was sufficient to support both the prosecutor's opening statement and Butler's conviction.

### C. *The Sentencing of Thomas*

The presentence report ("PSR") for Thomas, prepared by the Probation Department, initially calculated the offense level for his robbery and conspiracy offenses as 22 and his criminal history category as IV. Under the 1990 version of the Sentencing Guidelines ("Guidelines"), the version applicable to Thomas, this combination would have resulted in an imprisonment range of 63–78 months. The PSR noted, however, that Thomas's record included two prior felony convictions for armed robbery and concluded that Thomas was therefore to be sentenced as a career offender. Career offender treatment resulted in an offense level of 32, a criminal history category of VI, and an imprisonment range of 210–262 months. The statutory maximum prison term for a Hobbs Act violation is 20 years (240 months), and as a career offender Thomas was sentenced to a 210–month term on the Hobbs Act counts.

According to the PSR, Thomas's two prior robberies were committed within a period of 15 minutes. On April 5, 1976, at 3:00 a.m., Thomas robbed a gasoline station attendant at gunpoint, getting $28; at 3:15 a.m., he held up an attendant at another gasoline station, getting $50. After the latter robbery, Thomas was chased and apprehended by police officers, and he was immediately charged with that robbery. On May 3, 1976, apparently while in custody for the second robbery, Thomas was arrested and charged with the first robbery. He was tried for the second robbery in New York Supreme Court for Queens

County; he was convicted in March 1977 and sentenced to 10–20 years' imprisonment for that second robbery. Thereafter, he pleaded guilty in the same court with respect to the first robbery; he was sentenced in June 1977 to 30 months' imprisonment, to be served concurrently with his sentence on the second robbery.

In the district court in the present prosecution, Thomas, citing our then-recent decision in *United States v. Chartier*, 933 F.2d 111 (2d Cir.1991) (*"Chartier I"*), contended that he should not be sentenced as a career offender. He argued that his two robbery convictions should be considered a single conviction for purposes of the career offender guideline because they were part of the same common scheme or plan, since they involved the same type of crime, were committed by similar means, and were committed merely 15 minutes apart. The district court rejected his arguments. It stated in part that

> to say that it is part of a common scheme or plan if you have a series of bank robberies which are committed in one day by virtue of the fact that they are committed in one day, and not part of a common scheme or plan if they are committed over a period of six days, really doesn't make much sense.
>
> . . . .
>
> For example, if the defendant commits a number of offenses on independent occasions, separated by arrests, which is exactly this case, and the resulting criminal cases are consolidated, which is not this case, ... a combined sentence ... will not adequately reflect either the seriousness of the defendant's criminal history or the frequency with which he commits the crime.

(Sentencing Transcript ("Tr.") 15–16.) The court concluded that Thomas should be sentenced as a career offender.

Thomas pursues on appeal his contention that he should not be sentenced as a career offender because his prior robberies were committed pursuant to a common scheme or plan. He contends that the district court misinterpreted the law and made clearly erroneous findings of fact. For the reasons that follow, we conclude that the matter must be remanded for resentencing.

The career offender guidelines are the Sentencing Commission's response to instruction from Congress, in the Sentencing Reform Act of 1984, that repeat perpetrators of violent crimes and repeat drug traffickers should be sentenced "to a term of imprisonment at or near the maximum term authorized," 28 U.S.C. § 994(h) (1988). *See generally United States v. Chartier*, 970 F.2d 1009 (2d Cir.1992) (*"Chartier II"*); S.Rep. No. 98–225, 98th Cong., 1st Sess. 175 (1983) ("S.Rep."), *reprinted in* 1984 U.S.Code Cong. & Admin.News ("USCCAN") 3182, 3358 ("substantial prison terms should be imposed on repeat violent offenders and repeat drug traffickers"). Congress's premise in ordering severe sentences for such offenders was that the great majority of violent and drug trafficking offenses are committed by a small minority of offenders. *See* 128 Cong.Rec. 26,518 (Sept. 30, 1982) (remarks of Senator Kennedy, sponsor of predecessor of bill that became § 994(h)) ("[i]t is likely that 50 percent of all violent crimes are committed by only 5 percent of all criminals"). The goals of the mandate for severe punishment were (1) to "incapacitat[e]" the career offender, and (2) to "put on notice" any would-be repeat offenders that "chronic violence will be punished by maximum prison sentences." *Id.; see also* S.Rep., USCCAN at 3358.

The provisions adopted by the Commission to define career offender status wind a tortuous route through the Guidelines. The term "career offender" itself is defined as follows:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least *two prior felony convictions* of either a crime of violence or a controlled substance offense.

Guidelines § 4B1.1 (emphasis added). For these purposes, "two prior felony convictions" is defined to mean that

> (A) the defendant committed the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense (*i.e.*, two felony convictions of a crime of violence, two felony convictions of a controlled substance offense, or one felony conviction of a crime of violence and one felony conviction of a controlled substance offense), and (B) the sentences for at least two of the aforementioned felony convictions are *counted separately* under the provisions of Part A of this Chapter.

Guidelines § 4B1.2(3) (emphasis added). In explaining whether a defendant's "felony convictions are counted separately," Application Note 4 to § 4B1.2 refers to Guidelines § 4A1.2, which provides that

> [p]rior sentences imposed in *unrelated* cases are to be counted *separately*. Prior sentences imposed in *related cases are to be treated as one sentence* for purposes of the criminal history....

Guidelines § 4A1.2(a)(2) (emphasis added). Finally, the commentary to this section describes the meaning of the term "related cases":

> *Related Cases.* Cases are considered related if they (1) occurred on a single occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing.

Guidelines § 4A1.2 Application Note 3.

The net effect of this chain of provisions, for purposes of the present case, is that if the two violent crimes of which a defendant has previously been convicted are related because they were part of a single common scheme or plan, those prior convictions do not subject him or her to treatment as a career offender. The Guidelines direct us no further; they do not define "single common scheme or plan" or elaborate on what type of scheme or plan suffices to make a multiple offender not a career offender.

Nor do the Guidelines make clear whether other conditions might suffice to make prior felony convictions sufficiently "relat-ed" to require their treatment as one for purposes of a defendant's criminal history. Although Guidelines § 4A1.2 Application Note 3, quoted above, states three circumstances in which cases will be considered "related," there is no extrinsic evidence that the Commission intended those three circumstances to be exhaustive. Nonetheless, while we do not foreclose the possibility that "related cases" might have a broader meaning than that identified in Application Note 3, we emphasize that any interpretation must be consistent with congressional intent to ensure that repeat perpetrators of violent crimes and repeat drug traffickers receive prison terms at or near the statutory maximum.

 In *Chartier II*, filed today, we have discussed the meaning of the clearest indicator of "related" cases, *i.e.*, their linkage by a "common scheme or plan," as that concept relates to career offender treatment. We noted that the term "single common scheme or plan" is not synonymous with "same course of conduct." Whether or not acts have been performed pursuant to a "single common scheme or plan" is essentially a question of fact—both as to whether a single common scheme or plan existed and as to whether the prior offenses were part of it. Both inquiries require an evaluation of subjective as well as objective elements, and the court's findings as to both are reviewed under a clearly erroneous standard. Finally, we noted that the mere goal of funding a lifestyle is not a "single common scheme or plan" as the Commission has used that term to permit a person with prior predicate convictions to avoid career offender status:

> The mere fact ... that, in engaging in a pattern of criminal behavior, the defendant has as his purpose the acquisition of money to lead a particular lifestyle does not mean either that he had devised a single common scheme or plan or, if he had, that his course of conduct was necessarily part of it. We do not believe the Commission intended § 4A1.2 Application Note 3 to imply that crimes committed simply in order to fund a lifestyle

constitute parts of a single common scheme or plan; and if the Commission had so intended, we would not be able to conclude that it had carried out its congressional mandate. In sum, we conclude that evidence of a plan simply to commit robberies when and as money is desired or needed cannot be enough by itself to permit the repeat robber to avoid being considered a career offender.

*Chartier II*, 970 F.2d at 1016. Within this context, we address Thomas's challenges to the district court's ruling that he was a career offender.

Thomas contends that the district court ignored *Chartier I*, misinterpreted the Guidelines, made a clearly erroneous finding of fact, and did not actually consider the facts of Thomas's cases. We are persuaded that a remand is required principally because the court did not analyze the facts before it within the proper doctrinal framework.

 In rejecting Thomas's contention that his two prior robberies were part of a single common scheme or plan, the court appears to have taken the view that, as a matter of law, robberies committed over a span of several days could not be part of a common scheme or plan, and that hence it would not "make much sense" to find that robberies committed in a single day could be part of a common scheme or plan. This construct appears to suggest that crimes that are at all temporally separated cannot be viewed as related. We disagree. Whether the defendant had a scheme or plan, or whether the defendant committed crimes that were otherwise related, are questions of fact. And if he had a scheme or plan, whether the acts in question were performed pursuant to that scheme or plan is likewise a question of fact. Crimes committed pursuant to a single common scheme or plan need not be simultaneous or even homogeneous. For example, an act of arson, preceded or followed by an assault, if both were in fact committed in aid of a scheme to harass or extort something of value from a single victim, could properly be found to have been parts of a single common scheme or plan. Having adopted the view, however, that temporally separated crimes are not part of the same common scheme or plan as a matter of law, the district court did not purport to explore whether Thomas's robberies had been committed pursuant to a single common scheme or plan, or were otherwise "related," as matters of fact. We conclude that the matter must be remanded for consideration within the proper legal framework.

 Thomas's factual contentions are less compelling. There may be some merit in Thomas's contention that the district court also had a mistaken understanding of the sequence of Thomas's robberies and arrests. As part of an example, the court described a hypothetical "defendant [who] commits a number of offenses on independent occasions, separated by arrests, *which is exactly this case.*" (Tr. 16 (emphasis added).) In fact, of course, Thomas was not arrested in the 15-minute interval between his two prior robberies, and counsel hastened to point that out to the court; the court did not correct its prior statement or otherwise acknowledge the accuracy of the correction. There is, however, no requirement that the defendant's two predicate felonies have been separated by an arrest. In *Chartier I*, for example, the defendant was not arrested until after the last of his four prior armed robberies. Though an offender who has been arrested between his first and second offenses has perhaps demonstrated, more than one who has had no intervening arrest, that he is unlikely to mend his ways, the Guidelines do not remove the latter from the reach of the career offender provisions. *Cf. Chartier I* at 115 ("The offender who commits a third offense after *twice* not 'learning his lesson' from prior convictions may well be more deserving of enhanced punishment than the offender who has only once not 'learned his lesson' (though committing two prior offenses resulting in two convictions), but the Commission has discretion to apply the career offender guideline to both offenders."). Thus, though the court may have had a mistaken view of the sequence of

Thomas's robberies and arrests, this error would not suffice to require a reversal.

The more pertinent consideration is the fact that the record did not sufficiently lend itself to an analysis of whether in fact Thomas had a scheme or plan and, if he did, whether these two robberies were part of it, since Thomas did not testify. Thomas argues here that there is nothing in the record to show that the robberies were not related. He contends that "unifying" facts "leap from the record," and that since the two robberies were similar and occurred a mere 15 minutes apart it is "only by engaging in speculation" that one could conclude that the two robberies were not related. He argues that the obvious unifying purpose of the two robberies was the acquisition of money. We have several difficulties with these arguments.

 First, in suggesting that a finding of relatedness is required because there is nothing in the record to show that his two prior robberies were not related, Thomas would have us place the burden of proof on the government to prove lack of relatedness. Though the career offender guidelines are to be strictly construed in favor of the defendant, *see, e.g., United States v. Liranzo*, 944 F.2d 73, 79 (2d Cir.1991), and though the government generally has the burden of proving facts upon which the requested penalties are predicated, we disagree that it has the burden of proving that the acts underlying a defendant's prior unconsolidated convictions were not committed as part of a single common scheme or plan. As a general matter, principles as to the allocation of burden of proof rest on goals and access. *See generally* 9 J. Wigmore, *Evidence* §§ 2485–2486 (3d ed. 1940). A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue. *Id.* In the context of sentencing, if the government seeks increased punishment, it has the burden of proving that the circumstances warrant such an increase. *See, e.g., United States v. Font–Ramirez*, 944 F.2d 42, 49 (1st Cir.1991) (burden on government to prove sufficient facts for enhancements for, *e.g.,* obstruction of jus-

tice, possession of firearms), *cert. denied,* —— U.S. ——, 112 S.Ct. 954, 117 L.Ed.2d 122 (1992). If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease. *See, e.g., United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991) (financial inability to pay fine); *United States v. Garcia,* 920 F.2d 153, 156 (2d Cir.1990) (per curiam) (minor or minimal role in the offense).

 In the context of a request for treatment of a defendant as a career offender, the government has the burden of showing that the defendant has at least two prior convictions for the specified types of crimes. If there is a question as to whether those crimes were committed pursuant to a single common scheme or plan, part of the answer rests on elements that are subjective, and it is proper to place the burden of showing both (a) the existence of such a scheme or plan, and (b) the connection between the acts and the plan, on the party who has access to that information, *i.e.,* the defendant. Thus, in *United States v. Williams,* 905 F.2d 217 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991), the court upheld a finding that the defendant's prior offenses were not related within the meaning of the career offender guidelines based on the government's presentation of evidence that the defendant had previously been convicted of robbery on three separate occasions. The defendant had been given an opportunity to present evidence to rebut the inference that the offenses should be deemed separate for career offender purposes, and the district court had found his testimony not credible. The court of appeals concluded that "the government [had] established by a preponderance of the evidence that Williams's robbery convictions should be counted separately and he should be sentenced as a career offender." *Id.* at 218. *Cf. United States v. Gallman,* 907 F.2d 639, 643 (7th Cir.1990) (to show that the enhanced penalty provided in the Armed Career Criminal Act, 18 U.S.C. § 924(e) (1988) is called for, government need prove only that the defendant has three previous convictions for

offenses specified in that section; once the government has made that showing, the defendant has the burden of showing any defect in those prior convictions), *cert. denied,* —— U.S. ——, 111 S.Ct. 1110, 113 L.Ed.2d 219 (1991); *United States v. Ruo,* 943 F.2d 1274, 1276 (11th Cir.1991) (same); *United States v. Day,* 949 F.2d 973, 982 (8th Cir.1991) (same). To the extent that the record is barren of evidence as to whether or not two predicate convictions were part of a single common scheme or plan, the court should conclude that the defendant has failed to carry his or her burden.

■ Accordingly, in order to make a prima facie showing that the career offender guideline was applicable to Thomas, it sufficed for the government to prove that Thomas had two prior unconsolidated convictions for armed robbery. The burden then shifted to Thomas to persuade the court that the two were related because they were part of a single common scheme or plan.

■ In addition, we have difficulty with Thomas's suggestion that the temporal proximity of the two prior robberies sufficed to show a single common scheme or plan. Though the closer two events are in time the more credible the assertion may be that they occurred as part of the same plan, we cannot conclude that two similar robberies were part of a single common scheme or plan as a matter of law solely because they were committed 15 minutes apart. Whether there existed a plan or scheme and, if so, whether given acts were performed pursuant to the plan or scheme remain questions of fact.

■ Finally, we reject Thomas's suggestion that the mere goal of obtaining money can be the type of scheme or plan that permits a defendant to escape career offender status. *See generally Chartier II* (plan to commit robberies to fund a lifestyle not sufficient to constitute common scheme or plan within meaning of career offender guideline). And the record is barren of any evidence as to what other purpose, if any, Thomas may have had. Thus,

legally sufficient "unifying" facts do not appear in this record.

In all the circumstances, we vacate Thomas's sentence and remand the matter to the district court for further proceedings enabling the court to receive evidence and make findings as to whether or not Thomas's two prior robbery convictions were for offenses committed as part of a single common scheme or plan, or whether some other circumstance made them "related" for purposes of career offender status.

### III. CONCLUSION

We have considered all of the arguments of Butler and Harris on their appeals and have found them to be without merit. The judgments of conviction as to Butler and Harris are affirmed. The judgment of conviction as to Thomas is vacated, and the matter is remanded for further proceedings not inconsistent with the foregoing, in connection with whether or not he should be sentenced as a career offender.

JON O. NEWMAN, Circuit Judge, concurring:

Under the sentencing guidelines, a decision to sentence a defendant as a career offender usually results in a significant increase in the sentence. In the pending appeal, Marcellus Thomas would be sentenced to an extra 12 years of non-parole time if he were sentenced as a career offender. In *United States v. Chartier,* 970 F.2d 1009 (2d Cir.1992) (*Chartier II*), decided this day, career offender sentencing results in an extra 14 years of non-parole time. Obviously, incremental punishments of that magnitude must be considered with care.

Career offender sentencing turns on both a legal interpretation of the relevant guideline and a factual assessment of the defendant's prior offenses. The legal issue concerns the standards for determining when prior offenses are sufficiently "related" so that they may not be counted separately in aggregating the two or more predicate offenses for career offender sentencing. The factual assessment concerns the particulars of the prior offenses alleged to be suffi-

ciently "unrelated" to satisfy the career offender guideline. In the pending appeal, the 12–year career offender increment for Marcellus Thomas turns on whether his two prior robberies of two gas stations, committed within 15 minutes of each other, in each of which less than $100 was obtained, were "related." The District Court concluded factually that these prior robberies were not "part of a single common scheme or plan," which is one of three criteria for "related" sentences explicitly set forth in the commentary to section 4A1.2. The unstated premise of the District Court's decision was that these three criteria are the exclusive tests of "relatedness." That premise would give the career offender guideline a needlessly harsh interpretation that leads to bizarre results.

Judge Kearse's opinion for the Court declines to assume that the three criteria in the Commission's commentary are exclusive and remands Thomas's sentencing for further consideration as to whether his two prior robberies were part of a single common scheme or plan "or whether some other circumstance made them 'related' for purposes of career offender status." I concur in Judge Kearse's opinion and add these additional views to elaborate the considerations that bear upon the legal standard of "relatedness" for purposes of career offender sentencing. A full understanding of the sentencing issue raised by this appeal requires some explication of the relevant statutory and guideline provisions.

To put the issue in perspective, it is useful to consider the problem faced by the Sentencing Commission in drafting a guideline to implement the career offender provision of the Sentencing Reform Act, 28 U.S.C. § 994(h) (1988). Congress said it wanted high sentences for a person convicted of a crime of violence "who has previously been convicted of two or more" crimes of violence. *Id.* As we pointed out in *United States v. Chartier*, 933 F.2d 111, 113–14 (2d Cir.1991) (*Chartier I*), the Sentencing Commission had to decide whether to count any two prior crimes of violence or to count only those crimes of violence that occurred in the sequence of crime-conviction-crime-conviction-crime. The latter situation covers the person who has twice failed to "learn his lesson," that is, he has twice committed an offense after being convicted of a prior offense. New York State follows that approach. *See* N.Y.Penal L. § 70.10(1)(c) (McKinney 1987). The Commission chose not to require a sequence of convictions between each predicate offense, yet the Commission also did not go all the way to the other extreme of just counting every pair of prior crimes of violence.

Instead, the Commission chose to count only prior crimes of violence in "unrelated cases." *See* U.S.S.G. § 4B1.2(3). The Commission carried out that choice by incorporating for the career offender guideline the standards applicable to counting sentences for purposes of determining the criminal history category. Thus, subsection 4B1.2(3) of the career offender guideline defines the requisite " 'two prior felony convictions' " to mean offenses for which "the sentences are counted separately under the provisions of § 4A1.1(a), (b), or (c)" of the criminal history category guideline, and subsection 4A1.2(a)(2) of that guideline requires that "[p]rior sentences in unrelated cases are to be counted separately."

There is no guideline that defines "unrelated cases" as used in subsection 4A1.2(a)(2) and hence no guideline that defines "unrelated cases" for purposes of the career offender guideline. There is only the commentary to section 4A1.2, which, in note 3, says two things. First, it says that prior sentences "are not considered related if they were for offenses that were separated by an intervening arrest (*i.e.*, the defendant is arrested for the first offense prior to committing the second offense)." Second, it says, "Otherwise, prior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing."

Obviously, these four circumstances do not cover all circumstances concerning prior sentences. Two prior sentences may have been imposed for offenses that were not separated by an intervening arrest, yet these sentences might *not* be within the

three identified categories of related sentences. The issue in the pending appeal is whether the three identified categories in the commentary are exclusive. The introductory word "[o]therwise" suggests that the Commission may have expected the categories to be exclusive. Yet the word does *not compel that conclusion.* The usage could simply mean, "If the offenses underlying prior sentences are not separated by an intervening arrest and the sentences do fall within the three categories, they are related." That does not tell us whether a pair of sentences that are (a) imposed for offenses not separated by an intervening arrest and (b) not within the three categories might nonetheless also be "related." Even if the Commission intended the three categories of note 3 to be exclusive, that determination is not contained in a guideline, but only in a commentary. Courts need not accept the implications of commentary, especially when doing so yields indefensible results. The governing statute obliges courts to consider the guideline ranges and "any pertinent policy statement," 18 U.S.C. § 3553(a)(4), (5); it does not require unswerving adherence to "commentary."

Since application of the career offender guideline usually results in an enormous increase in the sentence, we should be careful in deciding when that guideline applies. Some guidance may be obtained from the Commission's three explicit categories, especially the third. By including as "related" sentences those that are consolidated for sentencing, the Commission has shown that it is not requiring any precise relationship between the prior sentences to preclude them from being counted for career offender sentencing. There is no precise standard that courts use in deciding whether to consolidate cases for sentencing. It is normally no more than a matter of convenience. If one court has jurisdiction to impose sentences for various offenses, it is far more convenient to package the sentencing in one proceeding. Indeed, the very ease with which consolidation can be accomplished has persuaded a panel of the Ninth Circuit that this category of note 3 should be disregarded as inequitable and contrary to public policy. *See United*

*States v. Gross,* 897 F.2d 414, 416–17 (9th Cir.1990). Whether or not that decision is sound (it has been discarded in the Ninth Circuit, *see United States v. Fine,* 946 F.2d 650, 653–54 (1991), *reh'g in banc granted,* 963 F.2d 1258 (9th Cir.1992), following an in banc reversal of its premise that commentary may be disregarded, *see United States v. Anderson,* 942 F.2d 606, 613–14 (9th Cir.1991) (in banc)), the broad sweep of the "consolidation for sentencing" category indicates that the Commission is taking a fairly generous view of what constitutes "related" sentences for purposes of career offender sentencing and suggests that the three categories are not exclusive.

If the three categories in note 3 were deemed exclusive, some very odd consequences would result. The first is the one noted by the Ninth Circuit in *Gross*: two defendants who may have committed the same current offense and the identical two prior offenses, receive widely disparate sentences because the prior offenses of one of them were consolidated for sentencing. If the three categories are not exclusive, then, at least in some circumstances, a court can avoid the anomaly that troubled the Ninth Circuit. If the two prior offenses are factually related, a court can decline to impose career offender punishment on the person whose prior offenses were consolidated and can also reach the same result for the other person by ruling that his prior offenses, even though not consolidated for sentencing, are sufficiently "related" to avoid career offender sentencing.

The second anomaly of considering the three categories exclusive is illustrated by the problem we encounter in the pending appeal and our colleagues encounter in *Chartier II. Chartier II* also considers whether prior offenses are "part of a single common scheme or plan." If that category and the other two categories of the commentary are exclusive, we end up saying that the calculating criminal who wakes up one day and carefully conceives an elaborate plan to commit three robberies in a month and makes detailed preparations for his crimes is *not* punished as a career offender, but the drug addict who needs money for his habit and commits a robbery,

finds that the cash in the store he has chosen is not enough to buy drugs for that day, and then, 15 minutes after the first robbery, decides to commit a second robbery, *is* punished as a career offender. This makes no sense. This anomaly can readily be avoided by declining to consider the three categories of note 3 to be exclusive.

Since the guideline uses only the undefined standard of "unrelated cases," it makes more sense to construe this phrase in light of the sensible, middle-ground choice the Commission made in not requiring convictions to intervene between each sentence and also in not counting all prior violent crimes. The Commission was entitled to forgo the "learned a lesson twice" approach, but the guidelines should nevertheless be understood to authorize career offender punishment only for those who, on two prior occasions, have been convicted of offenses that really are "unrelated," even though not separated by an intervening conviction.

The facts of Thomas's two prior robberies present a strong case for a finding of sufficient relatedness to preclude career offender sentencing. Indeed, it is difficult to understand what meaning would be left of the word "related" if it did not apply to two robberies with the following common characteristics: (a) the crimes were committed by the same person, (b) the perpetrator acted alone, (c) the robberies both occurred at gas stations, (d) the crimes occurred within 15 minutes of each other, (e) the crimes occurred in the same jurisdiction, (f) less than $100 was obtained in both crimes, (g) the crimes were prosecuted in the same jurisdiction, and (h) concurrent sentences were imposed. Though no single factor necessarily establishes "relatedness," commonality of time, place, perpetrator, victims, means, results; prosecution, and punishment combine to make a finding of relatedness virtually inevitable. The Court rejects the finding of unrelatedness on the ground that the District Judge erred in assuming that robberies that are temporally separated cannot be related. The matter is returned for reconsideration to determine, without the incorrect assumption, whether the robberies were part of a common scheme or plan or were otherwise related so as to preclude career offender sentencing. Such reconsideration is well warranted in this case.

Equally warranted would be further consideration by the Sentencing Commission of the criteria for considering offenses to be related for purposes of career offender sentencing. If a New York court had consolidated for sentencing Thomas's two gas station robberies, it would not make sense to reduce Thomas's sentence by 12 years solely because of that fortuity. It makes no more sense to subject Thomas to the possibility of a 12-year increase in his sentence because the two robberies were not consolidated and might not be found to have been part of "a common scheme" or otherwise "related." Whatever sentence is ultimately imposed on Thomas, the imposition of 12 years of flat time should not turn on fact-finding that has little if any relevance to moral culpability. The Sentencing Commission should give renewed consideration to the definition of "related offenses" for purposes of career offender sentencing and make sure that the severe sentences required for "career offenders" are imposed only on those who plainly deserve them.