

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-21-2000

# United States v Beckett

Precedential or Non-Precedential:

Docket 99-1135

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v Beckett" (2000). *2000 Decisions.* Paper 62.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/62

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 21, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1135

UNITED STATES OF AMERICA

v.

JAMES CARROLL BECKETT,

        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Criminal No. 91-cr-00121-01)
District Judge: Honorable Thomas N. O'Neill, Jr.

Submitted Under Third Circuit LAR 34.1(a)
February 1, 2000

Before: BEFORE: MANSMANN, NYGAARD, and RENDELL,
Circuit Judges.

(Filed: March 21, 2000)

        Michael P. Gottlieb, Esq.
        Vangrossi & Recchuiti
        319 Swede Street
        Norristown, PA 19401
         Attorney for Appellant



        Christopher R. Hall, Esq.
        Suite 1250
        Office of United States Attorney
        615 Chestnut Street
        Philadelphia, PA 19106
         Attorney for Appellee

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Appellant James C. Beckett was found guilty of two
counts each of robbery and armed robbery, in violation of
18 U.S.C. SS 2113(a) & (d), and then sentenced by the
District Court. Because Beckett's trial counsel failed to file
a timely notice of appeal on his behalf, the District Court

agreed to re-sentence him so he could file a notice of appeal.

Becket now argues that the District Court erred by (1) determining that he was a career offender; (2) failing to provide him with his rights of allocution; (3) imposing restitution without determining his ability to pay, and delegating the restitution issue to the Bureau of Corrections to be dealt with at a later date; (4) sentencing him on both charges of armed bank robbery under 18 U.S.C. S 2113(d), and robbery under 18 U.S.C. S 2113(a); (5) permitting ineffective assistance of counsel and allowing reversible error to go uncorrected, when the Assistant United States Attorney referred to Beckett as a "repeat offender" at trial and Beckett's counsel did not object; (6) giving the jury an erroneous and confusing instruction; (7) violating his speedy trial rights; (8) allowing the guilty verdicts on the charges of robbery and bank robbery to stand when they were not supported by the evidence; and (9) allowing the guilty verdict to 18 U.S.C. S 2113(d) to stand when it was not supported by the evidence.

The government admits that the District Court erred by failing to make specific findings of fact concerning Beckett's ability to pay restitution, and by sentencing Beckett for both his convictions for armed bank robbery, and the lesser

2

included offense of bank robbery. We will reverse and remand for factual findings on the question of Beckett's ability to pay restitution. We will vacate the sentence imposed for the lesser included offenses of bank robbery, charged in Counts One and Three of indictment of March 26, 1991. We will affirm the District Court as to all other issues.

I. FACTS

In June, 1990, a man entered the Home Unity Bank branch located in Bensalem, Pennsylvania. He placed a box on the counter before teller Bea Ludwig. This box had an antenna and a lighted button on it. A co-worker, Cassandra Waters, saw the man place the box on the counter. She described him as wearing glasses, and an out of style, uncoordinated suit that caught her attention. She estimated that he was between 5'6" and 5'7" tall. Another bank employee, Anne McCauley, noticed that the man was wearing surgical gloves.

The man handed Ludwig a note that stated:

Stay calm. Say nothing. Do not look around nor at me

and nothing will happen. Highly-sophisticated remote
control bomb receiver facing you. I have a transmitter
in my pocket with a gun. Put all of the money in a
brown envelope with this note. No red dye. Do not be
a fool. Hurry. Wait two minutes after we leave before
moving.

Ludwig gave the man all of the money in her drawer,
$1,093. The man left the box on the counter, and exited the
bank. Ludwig then told a co-worker that she had been
robbed, and began to cry. Ludwig and the other people in
the bank retreated into the vault, and then to a neighboring
building to escape what they thought was a bomb.

The Bomb Squad used a robot to remove the box from
the Home Unity Bank. The robot carried the suspected
bomb outside to the parking lot, and broke it apart with a
single shotgun shell. The police then gathered all the debris
from the bomb as evidence, including a piece of antenna.

3

Cassandra Waters later picked Beckett's photograph out
of a photographic line-up, and also identified Beckett as the
robber from the witness stand at trial.

At the time of this robbery, Beckett lived with his wife,
Patricia Fuller, and a son, at the Creekside Apartments on
Knights Road in Bensalem, a short distance from the Home
Unity Branch that was robbed. The day after the robbery
Beckett paid $475 in cash for a 1980 blue Ford Granada.

Three months later, a man wearing glasses, a tie, and a
trench coat entered the Bensalem branch of Fidelity Bank.
He approached teller Maria Sanchez. She described him as
approximately 5'4" tall. The man handed Sanchez a note
and an envelope. The note instructed her not to look
around. It explained that there was a bomb which had been
activated. It warned her not to place a dye pack with the
money. Sanchez gave the man all the money she had,
including a night deposit she had been working on, totaling
$9,988.

Coincidently, a local resident was out for a walk near the
Fidelity Bank and saw a man wearing a trench coat run by.
The man was trying to get his right arm out of the coat
without using his left hand, as though he was holding
something with his left hand. The man then got into a blue
car, spun his wheels, and drove away.

When the police arrived, a teller reported that the robber
had used a bomb. A detective noticed a shoe box with
wrapping paper around it near one of the teller windows.

The detective evacuated the customers and employees, sealed off the area, and called the Philadelphia Bomb Disposal Unit. The Bomb Squad used a robot to remove the box and transport it to a remote area of the parking lot. It then shot the box with compressed air and water. Detectives collected the debris from the hoax bomb, including gift wrapping paper and the business section from the September 9, 1990 edition of the Philadelphia Inquirer. A detective located gift wrapping paper that was identical to that used in the hoax bomb from the Fidelity Bank robbery in a Pathmark store just opposite Beckett's Creekside apartment.

4

On the day of the Fidelity Bank robbery, Beckett traded in his blue Granada and paid $3,320 in cash for a 1986 Buick Electra. An employee from the used car dealership that sold Beckett the Buick found a glove in the back seat of the Ford Granada that Beckett had traded in. An FBI agent later recovered a brown bag from behind the front seat that contained a broken pair of eyeglasses.

Also on the same day, Beckett paid $1,300 to rent a new apartment at 10103 Northeast Avenue in Philadelphia. The next day, he paid $210.94 in cash for a TV. On the following day, he paid $2,314.97 in cash for furniture, a VCR, a stereo, and telephones. These expenditures totaled $7,145.91.

His girlfriend, Debra McCole, testified that she dated Beckett during the summer and fall of 1990. Beckett told her that he had rented the apartment at 10103 Northeast Avenue for her, and that he was going to furnish it for her, her son, and the baby she was expecting. He took her to see it after he bought his new car. He also gave McCole between $50 and $100. McCole identified the gift wrapping paper located by detectives at the Pathmark store, and identical to that used in the hoax bomb, as the same gift wrapping paper she had used for her son's birthday on September 30, 1990, the day before the Fidelity Bank robbery.

Beckett's wife, Patricia Fuller, told an FBI agent that she had never seen any pay stubs for Beckett around the house, and had not seen him with any cash. In the spring of 1989, Beckett told her that he was paying the rent. In fact, he had not, and they were almost evicted. Fuller took responsibility for the rent, telephone, and utilities in the summer of 1989. Beckett did not provide money towards these bills, although he did promise Fuller he would move her and her son to a new apartment at 10103 Northeast Avenue.

Police went to Beckett's new 10103 Northeast Avenue address on October 8, 1990. They found a sock containing $60 behind a vent on the second floor. Later that day, police went to Beckett's old apartment at Creekside and recovered a trench coat from the living room closet that belonged to him.

Detective Robert Schutter interviewed Beckett at his Creekside apartment. Beckett stated that he worked for a carpet installer named Joe Regan, earned $80 a day, was paid by check, but had not worked for two or three weeks. Detective Schutter found small pieces of a broken silver metallic antenna in a closet, and a September 9, 1990 edition of the Philadelphia Inquirer that had only one page from the Business Section. Joe Regan later testified that Beckett had worked for him last in September of 1989, not September of 1990 as Beckett had represented to the police.

Although Beckett was arrested by local authorities for the Fidelity Bank robbery, the evidence was presented to a federal grand jury, which returned a four-count indictment against Beckett. Counts One and Two charged robbery and armed robbery of the Home Unity Savings Bank in Bensalem, Pennsylvania. Counts Three and Four charged robbery and armed robbery of the Fidelity Bank in Bensalem, Pennsylvania. The armed robbery charges in Counts Two and Four stemmed from Beckett's use of the hoax bombs to secure monies from the tellers. Beckett filed a Motion to Dismiss the Indictment, on the basis of the delay between his state arrest and his federal indictment, which the District Court denied.

At trial, an FBI fingerprint specialist testified that she had identified one of Beckett's fingerprints on the newspaper recovered from the hoax bomb used in the Fidelity Bank robbery.

An FBI bomb expert examined the remnants of the hoax bombs and opined at trial that they were built either by the same person, or by persons having intimate knowledge of one another's activities. The expert noted that (1) both devices used a small cardboard box as a container; (2) both boxes were reinforced with 3/4 inch masking tape that was manufactured with the same paper; (3) both devices lacked a dummy explosive charge, meaning that there was no simulated switch or simulated explosive that represented a popular concept of what explosives looked like, such as flares, modeling clay, or PVC pipe; and (4) both devices were gift wrapped, an "extremely unusual" characteristic.

The agent testified that the FBI laboratory reviews

approximately 70 hoax bombs a year, and since 1983, only one other was gift wrapped.

At the close of the trial, counsel moved for a directed verdict of acquittal on the ground that the evidence failed to establish the elements of aggravated robbery under 18 U.S.C. S 2113(d). This section provides for a maximum five year sentencing enhancement if the defendant either assaulted any person or put their life in jeopardy by use of a dangerous weapon. The District Court granted this motion to the extent that the government intended to proceed on the "jeopardy" prong of Section 2113(d), but denied the motion as to the "assault" prong. The District Court then instructed the jury on the elements of both bank robbery and assault during the course of bank robbery by use of a dangerous weapon.

The jury returned verdicts of guilty on all counts. At the sentencing hearing, the District Court heard arguments on the question of whether the career offender provisions of the Sentencing Guidelines applied in light of Beckett's two prior convictions for bank robbery in 1982. The District Court found that the two prior convictions were not part of a single common plan or scheme, and that the career offender provisions applied.

The District Court provided Beckett with the right of allocution at the first sentencing hearing. Beckett addressed the court, asserted his innocence, and argued the evidence from trial.

The District Court sentenced Beckett to 262 months of imprisonment on Counts Two and Four -- the armed robbery counts -- and to concurrent terms of 240 months each on Counts One and Three, the statutory maximum sentence for the lesser included offenses of bank robbery. The District Court also directed the Bureau of Prisons to calculate Beckett's release date using the date he was first taken into state custody under a state arrest warrant, six months before his federal arrest.

The District Court also ordered that Beckett make restitution in the amount of $9,988 to Fidelity Bank and $1,093 to Home Unity Bank, for a total of $11,081 to be

paid on a schedule that would be established by the

probation office.

Beckett filed a motion pursuant to 28 U.S.C. S 2255, requesting that the District Court vacate his sentence because his counsel failed to file a notice of appeal. The District Court appointed new counsel, granted Beckett's motion, and scheduled a re-sentencing so that Beckett could file a timely appeal from that hearing.

At the second sentencing, newly appointed counsel again raised the question of whether the career offender provisions applied, and argued that the sentencing court could depart downward even if those provisions did apply. Beckett testified regarding his planning of the two 1982 robberies. The District Court found Beckett not credible, held that the career offender provisions applied, and reaffirmed its prior ruling that the guidelines range was 262-327 months. The District Court then departed downward because the career offender provisions overstated the defendant's criminal history and risk of recidivism, and imposed concurrent sentences of 180 months on all counts. The District Court also reiterated its instruction to the Bureau of Prisons that the date of Beckett's state arrest shall be used to calculate his release date.

Finally, the District Court reinstated the restitution order, but did not make findings of fact regarding the defendant's ability to pay, reasoning that it could adjust the amount at a later date if necessary.

II. DISCUSSION

A.

Section 4B1.1 of the Sentencing Guidelines directs the sentencing court to impose enhanced terms of imprisonment upon defendants who have been convicted of violent or controlled substances offenses, and who previously incurred two or more felony convictions for either crimes of violence or drug trafficking. Beckett argues that the District Court erred by declaring him a career

8

offender, claiming that his two prior bank robbery convictions were part of a common scheme.1  Therefore, he argues, they should have been counted as a single prior conviction, and the career offender enhancement should not have been applied to him.

Section 4B1.2(c)(2) states that to be counted towards Section 4B1.1's requirement of two prior felony convictions,

each prior felony conviction must be separate from any other prior convictions. Section 4A1.2(a)(2) provides that "[p]rior sentences imposed in unrelated cases are to be counted separately. Prior sentences imposed in related cases are to be treated as one sentence." Therefore, if a defendant has two prior felony convictions, but they stem from related cases, they are treated as a single conviction for purposes of applying the career offender enhancement of Section 4B1.1.

The question is when do two felony convictions stem from "related" cases. Application Note 3 to Section 4A1.2 explains:

> Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). Otherwise, prior sentences are considered related if they resulted from offenses that (A) occurred on the same occasion, (B) were part of a single common scheme or plan, or (C) were consolidated for trial or sentencing.

Beckett's convictions stemmed from (1) the robbery of the Western Savings Bank; and (2) the robbery of the Benjamin Franklin Federal Savings and Loan. Beckett was arrested on April 2, 1982 for both robberies. Beckett's two prior convictions for bank robbery were thus not separated by an

_____

1. Beckett also challenges his career offender status on the ground that his guilty plea colloquy to one of his prior convictions was defective. However, Beckett failed to raise this argument below or in any collateral attack on that judgment. He has therefore waived that argument. See Curtis v. United States, 511 U.S. 485, 497 (1994) (defendant must challenge prior conviction in separate collateral proceeding).

intervening arrest. However, they did not result from offenses that occurred on the same occasion, nor from offenses that were consolidated for trial or sentencing. He was charged by separate federal indictments, the cases were assigned to different federal judges, and the proceedings were never consolidated.

The only question is whether they were part of a single common scheme or plan. The Guidelines do not define this term, nor have we addressed the issue.2 However, the United States Court of Appeals for the Seventh Circuit has, and it held that the terms " `scheme' and `plan' are words of intention, implying that [the two offenses] have been jointly

planned, or at least that it would have been evident that the commission of one would entail the commission of the other as well." United States v. Ali, 951 F.2d 827, 828 (7th Cir. 1992).

Similarly, the United States Court of Appeals for the Second Circuit has held that two prior attempted robbery convictions were not related when they occurred four days apart, at different locations, and had separate victims. See United States v. Keller, 58 F.3d 884, 894 (2d Cir. 1995). The Court there rejected the defendant's arguments that because the robberies were part of a "robbery spree," the "two crimes had robbery as their common purpose." Id. The court stressed that temporal proximity does not suffice to show the "close factual relationship" between the two crimes that is needed to prove "relatedness." Id.

Once the government has established the existence of two prior violent or drug convictions, the burden for establishing that the prior convictions were part of a

_____

2. Beckett argues that the Sentencing Guidelines do define "common scheme" in the relevant conduct provisions set forth in Section 1B1.3, and that this definition should apply in the career offender context as well. We reject this argument, as the two provisions are designed to take different considerations into account and have different goals. See United States v. Cowart, 90 F.3d 154, 158 (6th Cir. 1996) (relevant conduct definition of "common scheme or plan" is not binding on career offender determination); United States v. Butler, 970 F.2d 1017, 1024 (2d Cir.), cert. denied, 506 U.S. 980 (1992) (Guidelines do not define "common scheme or plan" as it relates to application note 3 to Section 4A1.2).

10

common scheme or plan lies, logically enough, with the defendant who has access to that information. See United States v. Cowart, 90 F.3d 154, 159 (6th Cir. 1996). Here, the District Court afforded Beckett the opportunity to produce evidence that his prior robberies were part of a common scheme. This comes down to a question of fact, and we review the District Court's findings on this subject for clear error. See United States v. Butler, 970 F.2d 1017, 1024 (2d Cir.), cert. denied, 506 U.S. 980 (1992).

Beckett testified at his second sentencing hearing that he had planned the 1982 robberies and had made hoax bombs to carry them out at the same time. The District Court found that Beckett was not credible on this issue.

> If the district court's account of the evidence is
> plausible in light of the record viewed in its entirety,
> the court of appeals may not reverse it even though

> convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573–74 (1985) (citations omitted). Moreover, where the District Court's findings are based on credibility determinations, the rule "demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. at 575.

The District Court's findings were not clearly erroneous. Beckett offered only sparse details regarding his common plan, to the effect that he made two hoax bombs at the same time. Moreover, even assuming the truth of Beckett's assertions, "evidence of a plan simply to commit robberies when and as money is desired or needed cannot be enough by itself to permit the repeat robber to avoid being considered a career offender." Butler, 970 F.2d at 1024–25 (citation omitted). If we discount or disregard Beckett's assertion of a common plan, there is no evidence of a single plan or scheme; the fact that the device and victim were

11

similar does not transmute two offenses into conduct undertaken pursuant to a common plan or scheme. We are satisfied that Beckett's two prior convictions were properly considered as separate felony convictions.3 The District Court therefore did not err by applying the career offender enhancement to Beckett.

B.

Next, Beckett argues that the District Court erred by failing to provide him with his rights of allocution. The District Court did afford Beckett the right of allocution at his first sentencing hearing. Beckett asserted his innocence, and argued the evidence from trial. The District Court only scheduled a second sentencing hearing because Beckett's first counsel had deprived him of the right to appeal by failing to file a notice of appeal within ten days of the first sentencing. Moreover, Beckett took the stand during the second sentencing hearing, where he was represented by new counsel, and he had every opportunity to address the District Court.

Importantly, even were we to assume that Beckett was denied the right of allocution, we conclude that he was not

prejudiced because the District Court departed downward
from the Sentencing Guidelines range of 262–327 months,
imposing a sentence of 180 months. In so holding we follow
the Court of Appeals for the Fourth Circuit, which held in
United States v. Lewis, 10 F.3d 1086, 1092 (4th Cir. 1993),
that although it was error to deny a defendant his right of
allocution at sentencing, he suffered no prejudice because
he was sentenced to the Guidelines minimum.

_____

3. Our decision in United States v. Hallman , 23 F.3d 821 (3d Cir. 1994),
cert. denied, 513 U.S. 881 (1994), is not to the contrary. That case
applied Section 4A1.2(a)(1), not (a)(2), to determine whether a prior
conviction was part of the same offense for which the defendant was
being sentenced. We held that the intent of the defendant at the time of
the prior offense governed. Id. at 826 (citing United States v. Ali, 951
F.2d 827, 828 (7th Cir. 1992)). That reasoning supports our decision
here.

12

C.

Beckett, the government, and we agree that the District
Court erred by imposing restitution without determining
Beckett's ability to pay. At the close of Beckett's second
sentencing hearing, his new counsel requested that the
District Court make specific findings concerning Beckett's
ability to pay approximately $11,000 in restitution. The
District Court declined, on the ground that it could adjust
the restitution order after Beckett began to serve his term
of supervised release, if necessary.

The provisions of 18 U.S.C. S 3663 in effect at the time of
Beckett's offenses required sentencing courts to make
findings concerning a defendant's present and future ability
to pay restitution. The District Court should have followed
Section 3663 when it ordered restitution in this case,
despite changes made to the law after Beckett committed
the robberies. See United States v. Edwards, 162 F.3d 87,
92 (3d Cir. 1998) (ex post facto clause applies to Mandatory
Victims Restitution Act of 1996). We therefore remand for
findings of fact and re-sentencing on this issue.

D.

Beckett, the government, and we also agree that the
District Court erred by sentencing him concurrently on
both the charge of armed bank robbery under 18 U.S.C.
S 2113(d), and on the lesser included offense of robbery
under 18 U.S.C. S 2113(a). The District Court sentenced
Beckett to 180 months on Counts One through Four.
Count One charged the robbery of Home Unity Bank, in

violation of 18 U.S.C. S 2113(a); Count Two concerned the armed robbery of the same bank, in violation of 18 U.S.C. S 2113(d); Count Three involved the robbery of Fidelity Bank, in violation of 18 U.S.C. S 2113(a); and Count Four referred to the armed robbery of Fidelity Bank in violation of 18 U.S.C. S 2113(d).

The concurrent sentences imposed on Counts One and Three for the lesser included offenses of bank robbery violated the Double Jeopardy Clause. See Gov't of Virgin Islands v. Dowling, 633 F.2d 660, 668 (3d Cir.), cert. denied, 449 U.S. 960 (1980). We will vacate the sentence

13

imposed on Counts One and Three, the lesser included offenses of bank robbery. Beckett's sentences for the remaining counts stand.

E.

Beckett's next argument is that the District Court committed reversible error by allowing the Assistant United States Attorney to refer to Beckett as a "repeat offender." Beckett also argues that his counsel's failure to object to this characterization demonstrates that he received ineffective assistance of counsel. Beckett claims that this reference was made in "blatant disregard" of a pre-trial ruling by which the District Court excluded Beckett's 1982 bank robbery convictions from trial evidence.

This misconstrues the record. The Assistant United States Attorney said the following at the start of his opening statement:

> This case is about a deja vu bank robber, a repeat offender, a man who, within the span of three months, robbed two banks in the same town, Bensalem, using the exact same method, the exact same means. . . . The only question before you, ladies and gentlemen, is whether that man is the defendant, James Carroll Beckett.

This statement is not improper. The term "repeat offender" referred solely to the crimes under indictment. At trial, the government never mentioned Beckett's 1982 bank robbery convictions, either directly or indirectly.

F.

Beckett contends that the District Court gave the jury an erroneous and confusing instruction that warrants reversal. He challenges the following instruction by the District

Court to the jury:

> Now, I wanted to talk to counsel because I think
> something I said previously may have misled you, and
> I didn't certainly intend to mislead you. You'll recall I
> said that your verdict on any count doesn't control

14

> your verdict on any other count. In the context of this
> case, that's not true.
>
> And, the reason is that I've just told you that as to the
> armed robbery counts, Counts 2 and Count 4 -- Count
> 2 and 4, that in Count 2 the Government must prove
> beyond a reasonable doubt, first of all, that there was
> a robbery. All the elements of that [are] charged in
> Count 1. So, obviously, in Count 1 if you find that the
> defendant did not commit the robbery alleged in Count
> 1 in the Home Unity Bank, then, obviously, you're not
> called upon to determine whether he committed that
> robbery as an armed robbery. And, in like manner, in
> Count 3, if you should find that he did not commit the
> robbery at the Fidelity Bank, well, then obviously in
> Count 4, he didn't commit an armed robbery of Fidelity
> Bank.
>
> So, on the other hand, if you find that he did commit
> the robbery in Count 1 at the Unity Bank, then you've
> got to go on and decide did he also commit an armed
> robbery at that bank in accordance with the law as I've
> outlined to you. And, in like manner, if you find in
> Count 3 that he committed the robbery at the Fidelity
> Bank, then you must also go on and consider whether
> he committed an armed robbery at the Fidelity Bank as
> defined in my instructions to you. Is that satisfactory,
> counsel?
>
> Counsel for Beckett: Yes, Your Honor.

Because Beckett did not object to this instruction at trial,
we review it only for plain error. See United States v. Tobin,
155 F.3d 636, 641 n.4 (3d Cir. 1998), cert. denied, 525 U.S.
1171 (1999). We hold that the District Court's instruction
clearly instructed the jury that (1) it should acquit the
defendant of armed robbery if it acquitted him of robbery;
and (2) that it had to consider separately the evidence on
armed robbery -- and determine whether the government
had met all of the required elements -- even if it found
Beckett guilty of the lesser included offense of robbery. This
is not error.

15

G.

Next, Beckett believes his right to a speedy trial was violated because of the nine month delay between his arrest by local authorities for the Fidelity Bank robbery and his federal trial for both the Fidelity Bank and Home Unity Bank robberies. We disagree.

The five year statute of limitations for non-capital federal offenses governs the time limit within which the federal government must bring an indictment for an offense. See 18 U.S.C. S 3282. Here, the government brought the Home Unity Bank charges within one year of the robbery, and the Fidelity Bank charges within nine months.

The federal Speedy Trial Act governs post-accusation periods of delay. See 18 U.S.C. S 3161. It requires the government to bring defendants to trial within 70 days of their indictment or first appearance before a judicial officer of the court in which the charge is pending, whichever date last occurs. See 18 U.S.C. S 3161(c)(1). The delay between Beckett's federal arraignment on April 11, 1991, and the commencement of his jury trial on June 10, 1991, was 60 days. This period is reduced to 35 days when permissible delay for the disposition of pre-trial motions is excluded.

Beckett argues that the federal government nonetheless violated his Due Process rights by intentionally delaying its indictment for a period of six months after the Fidelity Bank robbery and his local arrest. He fails, however, to specify how he was prejudiced.

Beckett can make out a claim under the Due Process Clause only if he can show both (1) that the delay between the crime and the federal indictment actually prejudiced his defense; and (2) that the government deliberately delayed bringing the indictment in order to obtain an improper tactical advantage or to harass him. See United States v. Lovasco, 431 U.S. 783, 789-90, 795-96 (1977); United States v. Ismaili, 828 F.2d 153, 168 (3d Cir. 1987), cert. denied, 485 U.S. 935 (1988).

Beckett has not shown either actual prejudice or improper delay. He does not, for instance, claim that items of evidence or documents were lost, witnesses became

16

unavailable, or that memories faded as the result of the six month delay. See United States v. Marion, 404 U.S. 307, 325-26 (1971) (appellee failed to demonstrate that 38

month delay actually dimmed memories, made witnesses inaccessible, or caused evidence to be lost).

Nor has he shown that the federal government delayed the indictment deliberately to harass him or to gain some improper advantage. The Due Process Clause does not require prosecutors to file charges as soon as probable cause exists, or even at the point where the government's investigation, though incomplete, has assembled sufficient evidence to prove guilt beyond a reasonable doubt. See Lovasco, 431 U.S. at 791-95. We see no evidence of improper delay while the federal government was building its case against Beckett regarding the robbery of the Home Unity Bank, an armed robbery not charged by the state authorities.

H.

Beckett challenges the sufficiency of the evidence against him regarding the charges of robbery and bank robbery, and believes that the District Court erred as a matter of law by allowing these verdicts to stand. We must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision. See United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992) (citing Burks v. United States , 437 U.S. 1, 17 (1978)). We do not weigh evidence or determine the credibility of witnesses in making this determination. See Casper, 956 F.2d at 421.

The evidence presented at trial, and described in our summary of the facts above, amply established that Beckett was the individual who robbed the Home Unity and Fidelity Banks. The evidence was both circumstantial and direct. There was clearly sufficient evidence on which a reasonable jury could rely to reach its verdicts.

I.

Finally, Beckett argues that the District Court erred by allowing the guilty verdict for armed robbery under 18

17

U.S.C. S 2113(d) to stand, when it was also allegedly not supported by the evidence. In this regard, Beckett argues that the government failed to establish that the hoax bombs were dangerous weapons. We disagree.

Subsection 2113(a) of the bank robbery statute provides in pertinent part that:

> Whoever, by force or violence, or by intimidation, takes

. . . from the person or presence of another . . . money . . . belonging to . . . any bank . . . shall be . .. imprisoned not more than twenty years.

Subsection 2113(d) provides a five year increase in the maximum sentence for any person who,

in committing . . . any offense defined in subsections (a) or (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device. . . .

The District Court precluded the government from arguing that the "jeopardy" prong of Section 2113 applied in its closing. It instructed the jury only on the"assault" provision:

In order to sustain its burden of proof for the crime of armed bank robbery as charged in Count 2 of the indictment, the Government must first prove the three elements to be proved for bank robbery, as already stated. In addition, the Government must also prove that the defendant deliberately assaulted the Home Unity Savings Bank employees by the use of a dangerous weapon or device while taking the money. . . .

The term dangerous weapon or device means any object that can be used by one person to inflict severe bodily harm or injury upon another person. The weapon or device need not actually be capable of inflicting severe bodily harm or injury upon another to be dangerous, rather, a weapon or device may be considered to be dangerous if it instills fear in the average citizen creating an immediate danger that a violent response will follow.

18

The District Court's instructions accurately explained the elements of the assault prong of Section 2113(d). See Simpson v. United States, 435 U.S. 6, 11–12 n.6 (1978) (phrase "by the use of a dangerous weapon or device" modifies both "assault" and "jeopardy" provisions of subsection (d) regardless of the comma that followed the term "assaults any person").

The instructions also accurately explained that"[t]he weapon or device need not actually be capable of inflicting severe bodily harm or injury upon another to be dangerous, rather, a weapon or device may be considered to be dangerous if it instills fear in the average citizen creating an immediate danger that a violent response will follow."

In McLaughlin v. United States, 476 U.S. 16 (1986), the Supreme Court held that an unloaded gun is a "dangerous weapon" as that term is used in Section 2113(d). The Court rested its holding on three conclusions, each of which, the Court held, was independently sufficient:

> First, a gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place. In addition, the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue. Finally, a gun can cause harm when used as a bludgeon.

Id. at 17.

The bombs, although they turned out to be fakes, would reasonably have instilled fear in an average citizen, thereby creating an immediate danger that a violent response would ensue. They did instill such fear in this case. The Home Unity hoax bomb had an antenna and a light. The victim teller cried after the robber left. Detectives responding to both robberies called the Bomb Squad, causing the evacuation of numerous people from the buildings. The Bomb Squad used a robot to remove and destroy both hoax bombs. Clearly, they instilled fear in all those who saw them, and provoked a police response. They therefore

19

qualify as dangerous weapons under Section 2113(d). See United States v. Hamrick, 43 F.3d 877, 882–83 (4th Cir.) (en banc), cert. denied, 516 U.S. 825 (1995) (a"fake bomb, as a matter of law, may constitute a dangerous weapon[under S 2113(d)], regardless of its actual capabilities, when a victim confronted with it is placed in reasonable expectation of danger") (quoting United States v. Spedalieri, 910 F.2d 707, 709 (10th Cir. 1990)).

III. CONCLUSION

In summary, we will reverse and remand for factual findings on the question of Beckett's ability to pay restitution. We will vacate the sentence imposed as to the lesser included offenses of bank robbery, in violation of 18 U.S.C. S 2113(a), charged in Counts One and Three of the indictment of March 26, 1991. We will affirm the District Court as to all other issues.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit